IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

GLENN HARALSON, etc.,              )
                                   )
        Plaintiff,                 )
                                   )
        v.                         ) CIVIL ACTION 19-0264-WS-MU
                                   )
UNITED STATES OF AMERICA, etc.,    )
et al.,                            )
                                   )
        Defendants.                )

## ORDER

This matter is before the Court on the defendants' motions for summary judgment. (Docs. 94, 98).  The parties have filed briefs and evidentiary materials in support of their respective positions, (Docs. 97-98,103-06), and the motions are ripe for resolution.  After careful consideration, the Court concludes that each motion is due to be granted in part and denied in part.

## BACKGROUND

According to the second amended complaint, (Doc. 32), the plaintiff, an air traffic controller, was the lone passenger on an elevator in an air traffic control tower at Brookley Field.  He entered the elevator on the ninth floor and pressed the button for the first floor.  The elevator got stuck around the third floor for about an hour.  When an employee of the Federal Aviation Administration ("FAA") reset the elevator, it went into freefall to the first floor, causing injuries to the plaintiff.

The second amended complaint names as defendants the United States, KONE, Inc. ("KONE"), and Hurtvet Subcontracting, LLC ("Hurtvet"),[1] asserting claims for:  (1)

---

[1] The claims against Hurtvet were later dismissed pursuant to Rule 41(a)(1)(A)(ii). (Docs. 87, 88).

negligence; (2) negligent failure to maintain premises; (3) negligent failure to warn; (4) negligent failure to train and/or supervise; (5) negligent failure to timely remedy an unsafe condition; and (6) negligence/premises liability.  (Doc. 32 at 4-8).  The United States and KONE seek summary judgment as to all counts.[2]

## DISCUSSION

Summary judgment should be granted only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The party seeking summary judgment bears "the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial."  *Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 608 (11th Cir. 1991).  The moving party may meet its burden in either of two ways: (1) by "negating an element of the non-moving party's claim"; or (2) by "point[ing] to materials on file that demonstrate that the party bearing the burden of proof at trial will not be able to meet that burden."  *Id*.  "Even after *Celotex* it is never enough simply to state that the non-moving party cannot meet its burden at trial."  *Id*.; *accord Mullins v. Crowell*, 228 F.3d 1305, 1313 (11th Cir. 2000); *Sammons v. Taylor*, 967 F.2d 1533, 1538 (11th Cir. 1992).

"If the party moving for summary judgment fails to discharge the initial burden, then the motion must be denied and the court need not consider what, if any, showing the non-movant has made."  *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1116 (11th Cir. 1993); *accord Mullins*, 228 F.3d at 1313; *Clark*, 929 F.2d at 608.  "If, however, the movant carries the initial summary judgment burden ..., the responsibility then devolves upon the non-movant to show the existence of a genuine issue of material fact." *Fitzpatrick*, 2 F.3d at 1116.  "If the nonmoving party fails to make 'a sufficient showing

---

[2] The second amended complaint clearly names the United States as a defendant under all six counts.  It expressly identifies KONE as a defendant only with respect to Counts Four, Five and Six.  KONE, however, addresses Counts One and Two on their merits without objecting that it is not a defendant thereunder.  (Doc. 98 at 2, 8-10; Doc. 105 at 2-4).

on an essential element of her case with respect to which she has the burden of proof,' the moving party is entitled to summary judgment." *Id.* at 608 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)) (footnote omitted); *see also* Fed. R. Civ. P. 56(e)(2) ("If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may … consider the fact undisputed for purposes of the motion ….").

In deciding a motion for summary judgment, "[t]he evidence, and all reasonable inferences, must be viewed in the light most favorable to the nonmovant …." *McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1243 (11th Cir. 2003). "Therefore, the [non-movant's] version of the facts (to the extent supported by the record) controls, though that version can be supplemented by additional material cited by the [movants] and not in tension with the [non-movant's] version." *Rachel v. City of Mobile*, 112 F. Supp. 3d 1263, 1274 (S.D. Ala. 2015), *aff'd*, 633 Fed. Appx. 784 (11th Cir. 2016).

 "There is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment." *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995); *accord Gennusa v. Canova*, 748 F.3d 1103, 1116 (11th Cir. 2014).  The Court accordingly limits its review to those arguments the parties have expressly advanced.

## I. Summary of the Evidence.

In accordance with the rules governing the resolution of motions for summary judgment, this section summarizes the plaintiff's version of the facts to the extent supported by the record.  It is supplemented by additional material cited by the defendants, some of which is in tension with the plaintiff's version but which is included because it is central to the defendants' arguments.  Other evidence cited by the parties is omitted below, either because it is in conflict with the plaintiff's evidence, or because it is tangential and/or unemphasized by the parties, or because its consideration could not alter the proper resolution of the instant motions.

### A.  The Incident.

Shortly before his shift ended at 9:00 p.m. on June 7, 2017, the plaintiff descended a flight-and-a-half of stairs to the tower elevator.  He entered the elevator on the ninth floor and pushed for the ground floor.  The elevator stopped en route, and the plaintiff could not make it move again.  He used his cell phone to call Charles Smith, an air traffic controller on duty in the tower, advising he was stuck and that Smith might have to take the stairs.  The plaintiff then called the Atlanta Operations Control Center ("AOCC") for the FAA, which resulted in Robert Kelley, a technician employed by the FAA,[3] eventually arriving at the tower.  Kelley yelled up at the plaintiff that he was going to reset the elevator.  Within a minute, the elevator dropped.  When the elevator dropped, the plaintiff was sitting down with his back (but not shoulders) against the wall and his legs flat on the floor.  It happened fast, and the plaintiff remembers only having his cell phone in his right hand, putting his left arm down, and feeling quite a bit of pain.  Kelley yelled at the plaintiff, asking if he was okay, with the plaintiff responding he was not sure.  About the same time, Smith called the plaintiff and asked what had happened, saying that "[t]he whole tower shook."[4]  Fifteen or twenty minutes later, Kelley got the elevator doors open, and the elevator was a foot and a half or two feet below ground floor level.  Kelley found the plaintiff lying on the floor, with his head on his lunchbox.  The plaintiff told Kelley he thought he hurt his back and was going to the emergency room. (Doc. 93-1 at 28-29, 53-54; Doc. 93-2 at 14-15; Doc. 103 at 84-85, 89-92).

Kelley reported on the day of the incident that the lights showed the elevator was on the second floor.  (Doc. 103-17).  Kelley testified that it sounded to him, when he and the plaintiff were yelling at each other, like the plaintiff (whom Kelley knew to be on the

---

[3] (Doc. 94 at 6).

[4] The government offers no hearsay objection to the plaintiff's testimony as to what Smith said about the tower shaking.  This is presumably because it recognizes the plaintiff could offer such testimony, not to prove the truth of the matter asserted, Fed. R. Evid. 801(c)(2), but to rebut a charge of recent fabrication.  *Id*. Rule 801(d)(1)(B)(i).

floor) was at the level of Kelley's head, or about six feet above ground level.  (Doc. 93-2 at 17).  Because the plaintiff testified that Kelley "yelled up" to him and that he "replied back down," (Doc. 103-22 at 91), however, there is evidence that the plaintiff was more than six feet above ground level.

According to the plaintiff, Smith testified that he heard something abruptly bang below him and that his seat shook and vibrated him as he sat in it.  (Doc. 104 at 6).  The plaintiff did not submit this – or any – portion of Smith's deposition into evidence.  The government, however, submitted and addressed other portions of Smith's deposition that support much the same point.  (Doc. 94 at 27).  There is thus record evidence that, after the plaintiff called him, Smith suddenly felt something underneath in the location of the elevator, which shook his seat.  (Doc. 94-24 at 7-8).

The plaintiff also offers Smith's testimony that, when he reached the ground floor after descending the stairs to check on the plaintiff, Kelley told him, "man, I – I hit the reset button like we normally do, and it just – he said the elevator just collapsed and fell to the floor."  (Doc. 104 at 6).[5]  The government submitted and highlighted this portion of Smith's deposition, (Doc. 93-24 at 4-5), so the plaintiff may rely on it.  The government objects to Smith's testimony as speculative, as hearsay, and as contrary to Kelley's deposition testimony.  (Doc. 106 at 6).  For present purposes, the Court rejects each of these objections.[6]

_____

[5] The "he" in Smith's testimony might reasonably be construed to mean either Kelley (*i.e.*, Kelley told Smith the elevator just collapsed and fell to the floor) or the plaintiff (*i.e.*, Kelley told Smith what the plaintiff told Kelley).  The government construes "he" as Kelley, (Doc. 106 at 6), demonstrating that it is a reasonable inference from the testimony.  It is thus the construction that must be accepted for purposes of the instant motion.

[6] As for speculation, the government addresses only different testimony – regarding Smith's conclusions as to what happened.  (Doc. 106 at 6 (citing Doc. 94 at 27)).  The government has not offered to explain how the statement of Kelley – who was right there when the incident occurred – confirming that the incident had occurred could be speculative, and Smith certainly was not speculating by repeating what Kelley said directly to him.  The government simply assumes Smith's testimony is hearsay, without addressing or even acknowledging the Federal Rules of Evidence, which establish that a statement "offered against an opposing party [that] was made by the party's agent or employee on a matter within the scope of that relationship and while it existed" is "not hearsay."  Fed. R. Evid. 801(d)((2)(D).  The

### B.  Kelley's Conduct.

Before arriving at the tower, Kelley participated in a three-way call involving an AOCC representative, KONE employee Jacob Busby, and Kelley.  According to Kelley, he asked Busby, "Do you want me to reset it?"  Busby responded, "Yes, reset the elevator. …  That will bring him down."  Kelley then asked the AOCC representative if Busby had told him to reset the elevator, and she affirmed that he had.  (Doc. 93-2 at 13).  According to Busby, who was also en route to the tower but whose estimated arrival time was about half an hour behind Kelley's, Kelley asked, "Can I turn the disconnect off and turn it back on, reset the cycle of power?"  Busby responded, "I can.  But if you do, that's on you."  (Doc. 93-4 at 36; *accord id*. at 6).  Kelley had been instructed by elevator personnel in the steps to take to reset the elevator, and each elevator contractor over the years gave him general consent to do so.  (Doc. 93-2 at 4-9, 25-26).

Kelley killed power, turned the power back on, and hit the down button; nothing happened.  Kelley then reset the controller and heard movement.  (Doc. 103-17).

KONE's expert stated there was no indication the plaintiff was in danger and thus no reason for Kelley to change the status quo pending Busby's arrival.  He further stated that the relevant ANSI standard prescribes that any evacuation from an elevator be performed under the supervision of elevator personnel or by other rescue personnel trained in the proper procedures – training Kelley lacked.  (Doc. 93-20 at 6).

### C.  Elevator Inspection, Maintenance and Testing.

KONE began performing maintenance services on the subject elevator several years before the incident, first under direct contract with the FAA and then under subcontract to Hurtvet.  (Docs. 93-5, 93-6, 93-20 at 5).  KONE performed preventive

---

government does not deny that Kelley was an FAA employee performing his elevator duties in resetting the elevator.  Finally, as explained earlier in this opinion, conflicts in testimony must be resolved at the summary judgment stage in favor of the non-movant, so Kelley's denial of having said what Smith asserts he said is legally irrelevant.

maintenance, checking the "basic operation" of the elevator, on June 21, July 27, August 30, September 28, October 13 and November 19, 2016.  (Docs. 103-3 to 10).  KONE also performed an annual safety test on November 9, 2016.  (Doc. 103-10 at 2).  KONE performed additional preventive maintenance checks on January 9, February 9, March 30, and April 27, 2017.  (Docs. 103-12 to -14, 103-16).  KONE also made a service call in January 2017, resulting in cleaning the landing door interlock.  (Doc. 103-12).  Finally, KONE performed a five-year test on March 30, 2017.  (Doc. 103-14 at 3-7).  The five-year test reflected no maintenance or operational deficiency.  (Doc. 93-8 at 3; Doc. 93-20 at 5).  A five-year test is a full load test, where the elevator is weighted and then dropped with every safety mechanism bypassed except the governor, which stops the overspeeding elevator when the specified force is reached; the test is conducted only once in five years because "you're putting a huge strain on your elevator," and "you have a good chance of breaking lots and lots of stuff inside there."  (Doc. 103-15).

The plaintiff asserts that KONE was required by contract to inspect the elevator every month.  (Doc. 103 at 9).  The only evidence he cites, however, is Kelley's testimony that KONE *in fact* checked the basic operation of the elevator "about once a month."  (Doc. 103 at 3 (citing 93-2 at 10)).  Neither KONE's subcontract with Hurtvet, nor Hurtvet's contract with the FAA (which identifies the scope of work under the subcontract) states how frequently KONE must perform any service.  (Docs. 93-5, 93-6).  KONE's retained expert has opined that KONE "followed the applicable code and industry standards with respect to inspection, testing and maintenance of passenger elevators," including certain ASME standards.  (Doc. 97-2).  The FAA's expert opined similarly.  (Doc. 93-18 at 3).

### D. Expert Testimony.

The plaintiff offered no expert testimony.  Between them, the two defense experts offered a number of opinions in addition to those addressed above.  First, the most likely cause of the elevator stopping in mid-descent is a failure of the motor control drive.  This is not a maintainable component, and neither inspections nor testing would determine

whether a motor control drive is reaching the end of its useful life.  (Doc. 93-18 at 4; Doc. 93-20 at 6; Doc. 93-21 at 4).

Second, Kelley's resetting of the elevator, after it was stuck, had nothing to do with the motor control drive becoming defective.  (Doc. 93-21 at 29).  Third, a motor control drive failure could not have caused the elevator to fall any distance whatsoever. (*Id*. at 4).  Fourth, there is no reason to believe that turning the elevator disconnect switch off and then on would cause the elevator to experience an uncontrolled drop.  (Doc. 93-18 at 3; Doc. 93-21 at 19-20).

Fifth, under the evidence and laws of physics, it is impossible that the elevator could have experienced an uncontrolled drop or free fall after Kelley reset the elevator. The counterweight outweighed the occupied elevator by many hundreds of pounds, such that in event of freefall, the counterweight would fall down and the elevator would fall up.  Given those comparative weights, the only way a freefall could have occurred is if the hoist ropes themselves had failed catastrophically, which did not happen.  Moreover, a freefall would have caused physical marks on, or damage to, the underside of the elevator, and the photographic evidence shows none.  (Doc. 93-18 at 3; Doc. 93-20 at 6; Doc. 93-21 at 21-22, 25).

Sixth, after Kelley reset the elevator, it did not attain a speed exceeding about three miles per hour.  The contract speed of the elevator is 200 feet per minute (2.27 mph).  The elevator has a governor that is triggered electrically at 230 feet per minute (2.61 mph) or mechanically at 280 feet per minute (3.18 mph).  Because the governor was not tripped, the elevator's top speed could not have exceeded the latter figure.  (Doc. 93-20 at 5-6).

Seventh, under modern safety codes, a stopping rate of 1G is considered safe and not likely to cause injury, and the laws of physics dictate that the maximum stopping rate experienced by the elevator was below that threshold.  (Doc. 93-20 at 7-9).

### E.  Medical Evidence.

Promptly upon being freed from the elevator, the plaintiff drove himself to Mobile Infirmary and was seen in the emergency room, where he complained of back pain at a level of five on a scale of ten.  (Doc. 93-1 at 17-18; Doc. 93-9 at 4).  The plaintiff's treating physician, Dr. Wiggins, believed the plaintiff was injured in the incident, based upon his immediate trip to the emergency room, his prompt presentation to Dr. Wiggins thereafter for treatment, and the physical findings made by Dr. Wiggins of spinal stiffness and muscle spasm pain, which are compatible with an acute injury.  (Doc. 93-12 at 12-13).  Dr. Volkman, apparently a defense expert, stated that the plaintiff's CT scan and MRI revealed no evidence of a compression fracture, torn disc or herniated disc, and he opined that it was "unlikely" a seated passenger could freefall "from between the second and third floors" without experiencing such acute pathology.  (Doc. 93-10 at 2-3).

## II.  Legal Analysis.

The parties agree that the plaintiff's claims against the United States are brought under the Federal Tort Claims Act ("FTCA") and that those claims are to be analyzed under Alabama law.  The parties further agree that, as to the United States, the plaintiff was a business invitee for purposes of Alabama negligence law based on premises liability.  (Doc. 94 at 14-15; 104 at 8).

All the asserted causes of action sound in negligence.  "To establish negligence, the plaintiff must prove:  (1) a duty to a foreseeable plaintiff; (2) a breach of that duty; (3) proximate causation; and (4) damage or injury."  *Lemley v. Wilson*, 178 So. 3d 834, 841 (Ala. 2015) (internal quotes omitted).

Claims of negligent service or repair of an elevator, brought against a non-landowner elevator company, are governed by general principles of negligence.  *Shanklin v. New Pilgrim Towers, L.P.*, 58 So. 3d 1251, 1256 (Ala. Civ. App. 2010).  The plaintiff does not dispute KONE's reasonable extrapolation that the same applies to claims of negligent testing, inspection and maintenance.  (Doc. 98 at 8).  As for duty and breach, the plaintiff has "the burden of presenting substantial evidence that, taking into account

all of the attendant circumstances, [KONE] did something or failed to do something that would violate the proper standard of care one must observe in repairing [or maintaining, testing or inspecting] an elevator." *Shanklin*, 58 So. 3d at 1256 (internal quotes omitted).[7]

As for the United States, "[t]he owner of premises owes a duty to business invitees to use reasonable care and diligence to keep the premises in a safe condition or, if the premises are in a dangerous condition, to give sufficient warning so that, by the use of ordinary care, the danger can be avoided." *South Alabama Brick Co. v. Carwie*, 214 So. 3d 1169, 1176 (Ala. 2016) (internal quotes omitted).[8]  Once the invitee enters the owner's elevator, he is "due the same degree of care for his safety as in the case of common carriers of passengers by railroad, street car, or motorbus," viz., "the highest degree of care known to careful, diligent, and skillful persons engaged in such business." *Ensley Holding Co. v. Kelley*, 158 So. 896, 898 (Ala. 1934); *accord Container Corp. of America v. Crosby*, 535 So. 2d 154, 156 (Ala. 1988).

### A.  Negligent Failure to Maintain (Counts Two and Six).

The plaintiff bases his negligent failure to maintain claim on the absence of any preventive maintenance check in May 2017.  (Doc. 103 at 9; Doc. 104 at 11).  As noted in Part I.C, the plaintiff asserts that KONE's subcontract required it to perform such maintenance at least once a month, but he has offered no evidence to support that proposition.  The defendants assert that their experts negated any breach of the duty of care based on frequency of inspection, (Doc. 94 at 18; Doc. 98 at 9-10), but their opinions

---

[7] KONE correctly, and without dispute by the plaintiff, argues it cannot be held liable under principles of premises liability, because it is uncontroverted that KONE was not the property owner.  (Doc. 98 at 7).  KONE is thus entitled to summary judgment as to Count Six.  Because KONE has not attempted to demonstrate that only landowners can be liable for failure to warn, it is not entitled to summary judgment as to Count Three on that basis.  KONE acknowledges that it, as well as the United States as landowner, can be liable for negligent failure to maintain or remedy under Counts Two and Five.  (Doc. 98 at 2, 8, 10).

[8] The plaintiff concurs.  (Doc. 104 at 8).  As to the United States, Count Six is thus redundant with Counts Two, Three and Five.

were expressed more generally and did not clearly address frequency.  In any event, KONE's expert relied for his opinion on ASME A17.1 and A17.2 (which have not been introduced into the record) as establishing the standard of care.  (Doc. 97-2 at 3).  In its principal brief, (Doc. 98 at 8-9), KONE invites the Court to analyze the claim as did its sister court in *Agee v. Chugach World Services Inc*., 2014 WL 5795555 (N.D. Ala. 2014).  According to the *Agee* Court, ASME A17.1 actually provides that "maintenance examinations of an elevator should be performed at least once per month" or "at a minimum frequency of one per month."  *Id*. at *4, *7.  There is thus a genuine issue of fact as to whether the defendants[9] breached their duty of care with respect to the frequency of preventive maintenance.[10]

To establish his claim of negligent failure to maintain, the plaintiff must also show the existence of a genuine issue of material fact as to whether the defendants' breach of the standard of care regarding the frequency of preventive maintenance proximately

---

[9] The United States concedes that its satisfaction *vel non* of the standard of care with regard to maintenance is to be evaluated identically to KONE's, based on KONE's conduct. (Doc. 94 at 19-24).

[10] In its reply brief, KONE proposes that, as long as the *average* frequency of preventive maintenance checks reaches or exceeds one per month, ASME 17.1 is satisfied.  It points to *Agee*, where the Court noted there had been an average of 1.375 visits per month in the twelve months before the *Agee* plaintiff's incident.  Because KONE says it made 44 preventive maintenance checks in the 35 months before the subject incident, it concludes it met the standard of care regarding frequency.  (Doc. 105 at 4).  KONE, however, points to nothing in *Agee* suggesting that a failure to inspect an elevator in the calendar month preceding an incident does not support a breach of the standard of care so long as, over an extended period of time, the number of inspections exceeds the number of months.  (By that logic, a defendant could inspect an elevator on twelve consecutive days and never again for eleven months, yet still satisfy the standard of care.)   The evidence in *Agee* was actually that, unlike here, preventive maintenance was performed on the subject elevator "every month" in the nine months preceding the incident. 2014 WL 5795555 at *3.  Moreover, the document on which KONE relies, (Doc. 93-22), disproves its calculations.  In fact, KONE made 44 preventive maintenance checks in the 47 months (not 35 months) preceding the incident.  It made only ten preventive maintenance checks in the twelve months preceding the incident, and only four such checks in the six months preceding the incident.  All of these figures result in an average of less than one preventive maintenance check per month.

caused injury to him. A showing of proximate cause would require proof of at least the following: (1) that the elevator descended at an improper speed; (2) that it did so due to a defect in the elevator; and (3) that a proper preventive maintenance check in May 2017 would have detected the defect. The Court addresses these in turn.

The plaintiff, who was aboard at the time, testified that the elevator fell. Smith testified that Kelley confirmed, minutes after the incident, that the elevator had "collapsed." And Smith further testified that, at the time of the incident, something in the location of the elevator shook violently enough to shake the seat in which he was sitting. The defendants have suggested no possible alternative cause for such shaking. This evidence plainly presents a fact issue as to whether the elevator, after being reset, descended in a freefall, an overspeed, or an otherwise improperly hasty manner. The United States offers three arguments in opposition to this conclusion.

First, the United States argues that the plaintiff's theory that the elevator descended at an improper speed is impermissibly speculative under Alabama law. (Doc. 94 at 26-28). A plaintiff's evidence is speculative under this test when it "points equally to inferences that are favorable and to inferences that are unfavorable to the moving party." *Shanklin*, 58 So. 3d at 1257. The plaintiff's evidence does not do so. According to his evidence, the plaintiff unequivocally testified that the elevator (in which he was a passenger) fell, Kelley (standing nearby) contemporaneously confirmed it had collapsed, and Smith (in the tower) contemporaneously felt a shaking that has defied explanation on any other theory. This evidence plainly points more strongly towards an inference of an improperly speedy descent and thus is not speculative.[11]

_____

[11] The United States relies on *Shanklin*, but in that case the plaintiff could not say whether the elevator was misleveled when she fell; nor could she say, assuming the elevator was misleveled, that this condition had caused her to fall. 58 So. 3d at 1257. Given the evidence, *Shanklin* appears to be an extreme application of the speculation rule, one from which Presiding Judge Thompson dissented, but in any event this case is easily distinguished from it. *See also Dodd v. GlassRatner Managment* [sic] *& Realty Advisors, LLC*, 2017 WL 3581723 at *3 (N.D. Ala. 2017) (distinguishing *Shanklin* where the plaintiff did not see the water on which she allegedly slipped but did see water elsewhere on the stairs, saw a man using a power-washer nearby, and observed that her clothes and backside were wet).

Second, the United States insists the defense experts' opinion that the elevator could not have descended at an excessive rate of speed negates the plaintiff's theory despite the plaintiff's evidence that such a descent in fact happened. (Doc. 94 at 26). The United States suggests that, in a contest between expert opinion and eyewitness testimony, the expert opinion must be accepted, with only contradictory expert evidence capable of raising a genuine issue of material fact. (*Id*. at 27). The United States identifies no legal authority for its position and, as noted above, the Court will not seek support for the parties' positions on their behalf.

Third, the United States says there are reasons beyond the expert testimony to question the testimony of the plaintiff and Smith. (Doc. 94 at 27, 29).[12] And so there may be, but the United States fails to demonstrate that the weighing of this evidence is for the Court and not the jury.

In summary, under the evidence and argument presented, the Court concludes that a fact issue remains as to whether the elevator, after being reset, dropped at more than proper speed.

As to the existence of a defect causing a descent at improper speed, the defendants' experts make clear that the elevator was so designed that it could not have descended above its proper speed. Because there is evidence the elevator did in fact descend above its proper speed, there is a reasonable inference that some undesigned defect in the elevator caused this descent. The defendants offer no relevant argument to the contrary.[13] Thus, under the evidence and argument presented, the Court concludes

---

[12] These include Smith's location vis-à-vis the elevator, the possibility that the plaintiff misperceived what was happening, and his failure to experience a more dramatic injury.

[13] The United States appears to suggest that the doctrine of *res ipsa loquitur* cannot be used to infer that a defect caused the elevator to descend too rapidly. (Doc. 106 at 5-6). This is presumably correct, since the doctrine addresses only inferences of negligence, *Nettles v. Pettway*, 306 So. 3d 873, 876 (Ala. 2020), not inferences of a defect. The inference of a defect here, however, does not rely on any reasoning resembling that underlying *res ipsa loquitur*. Instead, it arises from the evidence that the elevator descended at an improper speed, in tandem with the  evidence that a non-defective elevator could not have done so.

that a fact issue remains as to whether the elevator dropped at more than proper speed due to a defective condition of the elevator.

KONE correctly argues that, unless a preventive maintenance check in May 2017 would have discovered the condition that caused the elevator to descend at excessive speed, its failure to perform that service could not have caused the plaintiff's alleged injury. This for the simple reason that, if a proper check would not have found the defect, the situation is exactly the same as if no check occurred. As KONE notes, the plaintiff – who offers no expert on his behalf – has never identified the relevant defect, and KONE's expert states that "the specific cause of the incident is not known." (Doc. 93-20 at 6). As a result, KONE concludes, the plaintiff cannot create a fact issue as to whether a proper preventive maintenance check in May 2017 would have discovered the mystery defect. (Doc. 98 at 10; Doc. 105 at 3).

The plaintiff in response identifies no defect that caused the elevator to descend at improper speed.[14] Nor does he identify any evidence that KONE would have discovered this unknown defect had it performed a preventive maintenance check in May 2017. Instead, the plaintiff posits that the mere fact that no check was performed, of itself, "makes at least an issue of fact as to whether that failure to inspect [sic] could have found the issue that caused the elevator issue to occur." (Doc. 104 at 11). No rationale is provided for the startling assertion that a failure to perform a maintenance check automatically creates a jury question as to whether such a check would have revealed a defect that even now remains unknown. Nor does the plaintiff cite any legal authority in support of his *ipse dixit*. Moreover, the experts' evidence is uncontroverted that whether a proper preventive maintenance check would reveal a particular problem depends on a number of factors specific to what and where the problem is, including without limitation the part involved, its age, and its accessibility. (Doc. 93-20 at 9; Doc. 93-21 at 11-12).

---

[14] The only defect identified in the evidence is a failure of the motor control drive. It is uncontroverted, however, that this failure, while it could have caused the elevator to stop mid-descent, could not have caused the elevator to descend too rapidly – or at all – after reset. The plaintiff does not argue otherwise.

Because the plaintiff has no evidence that a proper preventive maintenance check in May 2017 would have found the unidentified defect that caused the elevator's alleged descent at improper speed, he cannot establish that the defendants' negligent failure to perform such a check proximately caused his injury. Both defendants are therefore entitled to summary judgment with respect to Count Two, and the United States is likewise entitled to summary judgment with respect to Count Six to the extent it is based on a negligent failure to maintain the premises.

### B. Negligent Failure to Remedy or Warn (Counts Three, Five and Six).

"Generally, an invitee must show not only that he was injured as the result of a defective condition on the owner's premises, but also that the owner knew or should have known of the defective condition." *Edwards v. Intergraph Services Co*., 4 So. 3d 495, 502 (Ala. Civ. App. 2008); *accord Marquis v. Marquis*, 480 So. 2d 1213, 1215 (Ala. 1985) (duty to invitee is to "use reasonable care to keep the premises in a reasonably safe condition" and "to warn of dangers of which [the landowner] knew or should have known" and of which the plaintiff did not know). This rule applies specifically to incidents involving elevators. *Waddell v. Colbert County-Northwest Alabama Healthcare Authority*, 97 So. 3d 178, 183-84 (Ala. Civ. App. 2012). The plaintiff acknowledges the general rule. (Doc. 104 at 8).

Under the general rule, the defendants cannot be liable for a failure to remedy an unsafe condition, or for a failure to warn the plaintiff about the existence of an unsafe condition, unless there is evidence the defendants knew of the unsafe condition or should have known of the unsafe condition. As addressed in Part II.A, the plaintiff has no such evidence. His claims for negligent failure to remedy or warn therefore fail under the general rule. The plaintiff makes no argument to the contrary.

Instead, the plaintiff invokes an exception to the general rule. (Doc. 104 at 8). "When the defendant or his employees have affirmatively created the dangerous condition, plaintiff need not introduce evidence that defendant had actual or constructive knowledge of the hazard. Under such circumstances, the courts presume notice."

*Dunklin v. Winn-Dixie, Inc.*, 595 So. 2d 463, 465 (Ala. 1992) (internal quotes omitted). According to the plaintiff, there is an issue of fact whether Kelley's action in resetting the elevator created a defect that caused the elevator to descend too quickly.  (Doc. 104 at 9).

The problem, as the United States notes, (Doc. 106 at 7), is that the plaintiff has no evidence that Kelley created a previously non-existent defect by resetting the elevator. The plaintiff appears to assume that the sequence of events – Kelley resets the elevator, and it then descends, too rapidly – is itself adequate evidence of the causal connection. Except that it is at least equally likely that the unknown defect pre-existed Kelley's action and was simply activated by it.  The plaintiff thus relies on precisely the sort of speculation that Alabama law, as described in *Shanklin* and other cases, prohibits as a basis for a jury issue as to liability.[15]

Because the plaintiff has no evidence with which to show, under the general rule, that the defendants knew or should have known of the unidentified dangerous condition of the elevator that allegedly caused it to descend too rapidly, and because he has no non-speculative evidence with which to establish liability under the only exception to the general rule that he has invoked, he cannot establish that the defendants negligently failed to remedy the condition or warn him of it.[16]  Both defendants are therefore entitled to summary judgment with respect to Counts Three and Five, and the United States is likewise entitled to summary judgment with respect to Count Six to the extent it is based on a negligent failure to remedy or warn.

---

[15] The *Edwards* opinion (which the United States cites for a different proposition, (Doc. 94 at 17)), states there is another exception to the general rule, pursuant to which the plaintiff "need not make a prima facie showing that the premises owner knew or should have known of the defective condition at the time of the invitee's injury," when "the premises owner has failed to perform a reasonable inspection or maintenance of the premises to discover and remedy the defective condition …."  4 So. 3d at 503.  Because the plaintiff did not invoke *Edwards* or the exception quoted above, the Court need not address it.

[16] It remains unclear how the plaintiff could have established that the defendants' failure to remedy, or warn him of, a dangerous condition was negligent when the condition injured the plaintiff simultaneously with its creation and thus prior to any opportunity to remedy or warn. The Court's ruling obviates consideration of this conundrum.

### C.  Negligent Failure to Train and/or Supervise (Count Four).

The plaintiff asserts that Kelley (an FAA employee) behaved negligently by resetting the elevator with him inside and that Busby (a KONE employee) behaved negligently by not prohibiting Kelley from doing so.  (Doc. 103 at 8; Doc. 104 at 10-11).  An employer's liability for negligent failure to train or supervise its employee requires proof of the employee's "incompetency" and of the employer's actual or presumed notice or knowledge of such incompetency.  Neither incompetency nor notice of same can be based on the negligent conduct that allegedly injures a plaintiff.  Such "negligence is not synonymous with incompetency, and a single instance of negligence will not prove an employee incompetent, nor will it impute knowledge to his employer of incompetency; the most competent employee may be negligent" on a given occasion.  *Collins v. Wilkerson*, 679 So. 2d 1100, 1103 (Ala. Civ. App. 1996).  Instead, a plaintiff must offer evidence of "specific acts of incompetency" other than the employee's negligence on the instant occasion.  *Armstrong Business Services, Inc. v. AmSouth Bank*, 817 So. 2d 655, 682 (Ala. 2001).

These principles are well established under Alabama law, they are relied on by the defendants, (Doc. 94 at 28; Doc. 98 at 6; Doc. 105 at 1-2), and the plaintiff does not dispute them.  The defendants argue the plaintiff has no evidence with which to make the required showing of past acts of incompetency, and the plaintiff makes no effective response.  He ignores the issue with respect to the United States but effectively concedes the point by insisting that Kelley had never before reset an elevator with a passenger inside.  (Doc. 104 at 10-11).  As to KONE, the plaintiff simply posits the conclusion that KONE negligently trained and supervised Busby, without addressing in any fashion the evidence necessary to establish such a claim.  (Doc. 103 at 8).

Because the plaintiff has no evidence of past acts with which to show that Kelley and/or Busby were incompetent or that the defendants were on notice of such incompetency, he cannot establish that the defendants negligently trained or supervised

their employees.  Both defendants are therefore entitled to summary judgment with respect to Count Four.

### D.  Negligence (Count One).

The plaintiff asserts a single theory of liability against the United States that does not depend on principles of premises liability but on what the United States calls "general negligence."  (Doc. 94 at 2).  According to the plaintiff, Kelley acted negligently by resetting the elevator with the plaintiff still inside.  That reset caused the elevator to descend, and that descent caused the plaintiff's back to be injured.  (Doc. 104 at 10-11).  Under this theory, the plaintiff need not establish either that the elevator had a defect or that the elevator descended at an improper speed.

The plaintiff has ample evidence that it was negligent for Kelley to reset the suspended elevator with a passenger aboard.  According to KONE's expert, such conduct constitutes a rescue/extraction/evacuation effort, which the standard of care requires, in the absence of existing danger to the plaintiff, to be performed by, or under the supervision of, persons that are trained in the proper procedures.  (Doc. 93-20 at 6).  The plaintiff was not in danger, (*id*.), Kelley lacked such training, (*id*.), and he was not acting under the supervision of Busby or anyone else.

The plaintiff also has evidence that Kelley's negligence in resetting the elevator caused his injury.  Had Kelley not reset the elevator, it would not have descended, and had it not descended, the plaintiff would not have been injured.  As KONE's expert stated, "had Mr. Kelley not reset the elevator, this alleged incident as described by the plaintiff would not have occurred."  (Doc. 93-20 at 6).

Finally, there is evidence the plaintiff was injured by the descent, even if the elevator descended at proper speed.  The plaintiff immediately complained of back pain, Kelley found him supine in the elevator (rather than sitting, as he had been at the moment of the descent), the plaintiff went immediately to the emergency room complaining of serious back pain, he sought out treatment from Dr. Wiggins five days later, and Dr.

Wiggins at that time detected spinal stiffness and muscle spasm pain consistent with an acute back injury.

The United States' response is muted. As to negligence, it notes only that Busby (who was trained in passenger extraction) testified that resetting power "is one of the methods he might have used" to free an entrapped person. (Doc. 106 at 9). But Busby also testified that the "main way" he would try to get a passenger out would be to place the elevator on inspection mode, giving him full control of the elevator, (Doc. 93-4 at 28) – which of course supports a reasonable inference that resetting the elevator is an inferior tactic.[17] In any event, the United States' argument misses the point, because the standard of care proscribes an untrained person from taking any unsupervised action to free a passenger, regardless of whether it would be appropriate for a trained person to take the same action.

The reasons for such a proscription do not appear in the record but are not difficult to imagine. Among them is the danger that an untrained person will not take the necessary precautions in attempting a maneuver. Here, for example, the plaintiff was sitting on the elevator floor, meaning that the G-forces upon the elevator's stop, as described by KONE's expert, were imparted directly to his buttocks rather than to his feet and legs (as would be the case had he been standing), making a back injury more likely.[18] Kelley knew the plaintiff was on the elevator floor but did not advise him to stand before causing the elevator to descend.

As to causation, the United States' only objection is that the "incident as described by the plaintiff" did not occur, in that the elevator did not descend at an improper speed. (Doc. 106 at 8). It is uncontroverted, however, that the reset caused the elevator to descend, and the plaintiff claims his injury occurred as a result of the descent, whatever its speed.

---

[17] According to Busby, inspection speed is "very, very slow," with run times six to eight times slower than contract speed. (Doc. 93-4 at 32).

[18] Dr. Volkman indicated that a serious back injury would be more likely from a seated position. (Doc. 93-10 at 3).

The United States trains most of its firepower on the suggestion that a controlled descent caused, or could have caused, an injury to the plaintiff's back.  The United States dismisses Dr. Wiggins' opinion that the plaintiff was injured in the incident, on the grounds he does not know how the elevator moved.  (Doc. 106 at 10-11).  This overlooks that Dr. Wiggins' opinion is not based on knowledge of what happened during the incident but on the plaintiff's uncontroverted statements and conduct after the incident, as well as the physical signs he exhibited consistent with a recent back injury.  The United States also stresses Dr. Volkman's opinion that the plaintiff's MRI and CT scan revealed physical changes consistent with the normal aging process rather than an acute traumatic event.  (*Id*. at 11).  The United States has not sought to demonstrate that a person's back cannot be injured unless structural changes are observed; in any event, the United States offers at best a conflict in opinion that cannot be resolved in its favor on motion for summary judgment.

Finally, the United States suggests the experts have opined that a controlled descent "could not have caused" the plaintiff's alleged injury.  (Doc. 106 at 2).  As noted by the United States, the experts in combination testified that the maximum speed of a controlled descent was 2.27 miles per hour; that this is the speed at which a person would be traveling if he slipped off a 2.1-inch curb; that the force exerted by a stop from this speed would be less than 1G; and that such force is safe, with low energy and very low potential for injury.  (Doc. 93-18 at 4; Doc. 93-20 at 7-9).  As is immediately apparent, no opinion is expressed that the plaintiff "could not have" been injured in a controlled descent; at most is an opinion that a controlled descent is "not likely to cause injury." (*Id*. at 7).  Indeed, the United States' expert expressly testified that he "do[esn']t know" if a controlled descent could have injured the plaintiff.  (Doc. 93-21 at 10).  Nor is it clear the defense experts have been qualified as experts in any field that would permit them to offer expert opinions as to whether the plaintiff was or was not injured.  In any event, the plaintiff has offered evidence that he was in fact injured, which conflicting evidence from the defendants' experts cannot negate on motion for summary judgment.

The plaintiff advances a similar negligence theory against KONE.  According to this theory, Busby behaved negligently by acquiescing in Kelley's plan to reset the elevator himself, with the plaintiff inside.  (Doc. 103 at 10).

KONE's brief and cryptic response describes the plaintiff's claim as one based on "vicarious liability," that is, KONE's liability for the "intervening actions" of Kelley, an "independent actor."  (Doc. 105 at 2-3).  KONE, however, does not advance, much less support, any legal argument (for example, lack of duty) as to why such a claim is unsustainable; simply describing the claim as "novel" and challenging the plaintiff to present legal authority supporting it, (*id*. at 3), is insufficient to carry a movant's initial burden on motion for summary judgment.

The only circumstance identified by KONE as arguing against the plaintiff's claim is that Busby, who was en route to the tower at the time, issued "warnings" to Kelley.  (Doc. 105 at 3).  KONE apparently refers to Busby's testimony that he told Kelley it would be "on you" were Kelley to reset the elevator.  According to Kelley, however, Busby specifically told Kelley to reset the elevator, and the Court cannot on motion for summary judgment resolve that factual dispute in KONE's favor.  Nor is it obvious that Busby's alleged comment rose to the level of a warning or that such a statement would satisfy as a matter of law any duty KONE may have owed the plaintiff under the circumstances.

## CONCLUSION

For the reasons set forth above, each defendant's motion for summary judgment is **granted** with respect to Counts Two through Six and **denied** with respect to Count One.

DONE and ORDERED this 12th day of February, 2021.

s/ WILLIAM H. STEELE
UNITED STATES DISTRICT JUDGE